

FILED IN DISTRICT COURT
OKLAHOMA COUNTY

JUL 1 4 2020

RICK WARREN
COURT CLERK
38____

**IN THE OKLAHOMA COUNTY DISTRICT COURT
STATE OF OKLAHOMA**

DAWN BOLT, HEIDI STINGLEY, DAHN GREGG, )
SHAWNA BURLEY, GLENDA SIMPSON, KIM )
KELLER,) NICHOLAS BROWN and LORD )
VINCENT CRUTCHER, on behalf of themselves and )
others similarly situated, )
)
        Plaintiffs, )
)
vs. )
)
STATE OF OKLAHOMA ex rel. )
THE DEPARTMENT OF HUMAN SERVICES, )
JUSTIN BROWN, individually and in his capacity as )
Director of THE DEPARTMENT OF HUMAN )
SERVICES, ED LAKE, individually and in his Capacity )
as former Director of THE DEPARTMENT OF )
HUMAN SERVICES, DR. DEBORAH SHROPSHIRE, )
individually and in her capacity as Director of the Child )
Welfare Services Division of THE DEPARTMENT OF )
HUMAN SERVICES, JAMI LEDOUX, individually )
and in her capacity as former Director of the Child )
Welfare Division of THE DEPARTMENTOF HUMAN )
SERVICES, TANYA MOSIER, individually and in her )
capacity as District Director of THE DEPARTMENT )
OF HUMAN SERVICES, EUGENE GISSANDANER, )
individually and in his capacity as Field Analyst of THE )
DEPARTMENT OF HUMAN SERVICES, SHEREE )
POWELL, individually and in her capacity as Director )
of Communications and Community Relations of THE )
DEPARTMENT OF HUMAN SERVICES, CALVIN )
KELLY, individually and in his capacity as Region )
Three Deputy Director of THE DEPARTMENT OF )
HUMAN SERVICES, JAMIE MAJORS, individually )
and in her capacity as Foster Care and Adoption )
Program Field Administrator of THE DEPARTMENT )
OF HUMAN SERVICES, MALLORY POPLIN, )
individually and in her capacity as Child Protective )
Services Supervisor of THE DEPARTMENT OF )
HUMAN SERVICES, AMY WHITSON, individually )
and in her capacity as Region One Deputy Director of )
THE DEPARTMENT OF HUMAN SERVICES, )
DAVID CLIFTON, individually and in his capacity as )
Region Five Deputy Director of THE DEPARTMENT )
OF HUMAN SERVICES, STEPHANIE HAILEY, )

Case No. CJ-2019-5914

1

**EXHIBIT 8**

individually and in her capacity as Child Welfare )
Supervisor of THE DEPARTMENT OF HUMAN )
SERVICES, DARYL JOHNSTON, individually and in )
his capacity as District Director of THE )
DEPARTMENT OF HUMAN SERVICES, and )
KAREN FEATHER, individually and in her capacity as )
Child Welfare Supervisor of THE DEPARTMENT OF )
HUMAN SERVICES, )
                                      )
          Defendants. )
                                        )

## FIRST AMENDED CLASS ACTION PETITION

COME NOW, Plaintiffs, individually and on behalf of themselves and all other current and former similarly situated Department of Human Services Child Welfare Division workers for their claims against the Oklahoma Department of Human Services and its officers and employees, individually and in their official capacities and allege and state as follows:

The Supreme Court of the United States recently told the State of Oklahoma, "[u]nlawful acts, performed long enough and with sufficient vigor, are never enough to amend the law. To hold otherwise would be to elevate the most brazen and longstanding injustices over the law, both rewarding wrong and failing those in the right." *McGirt v. Oklahoma*, No. 18-9526, 2020 WL 3848063, at *21 (U.S. July 9, 2020). This case involves the repeated and ongoing failures of the Oklahoma Department of Human Services that have continued for years. The state has been told more than once that it is acting unlawfully in regard to the protection of children in its care—and that these failures directly affect its employees—and has failed to take the action it has been ordered to undertake. Oklahoma has promised to change, but those promises, like the promises made to the tribes in *McGirt*, have gone unfulfilled. To maintain and cover up its failures, the State of Oklahoma has engaged in a pattern of threats and intimidation to keep employees quiet about its failures and when that no longer works, Oklahoma fires Department employees who

## EXHIBIT 8

speak out about its unlawful behavior. It's time to make it stop. It's time for Oklahoma to keep its promises to the employees, children, and families of this state.

Plaintiffs Dawn Bolt, Heidi Stingley, Dahn Gregg, Shawna Burley, Glenda Simpson, Kim Keller, Nicholas Brown, and Lord Vincent Crutcher, (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated (collectively, the "Classes," as more fully defined below), bring this class action complaint against Defendants the State of Oklahoma ex rel The Department of Human Services ("DHS"), Justin Brown, individually and in his capacity as current Director of DHS ("Brown"), Ed Lake, individually and in his capacity as former Director of DHS ("Lake"), Dr. Deborah Shropshire, individually and in her capacity as the current Director of the Child Welfare Services Division of DHS ("Shropshire"), Jami Ledoux, individually and in her capacity as former Director and former Interim Director of the Child Welfare Services Division of DHS ("Ledoux"), Tanya Mosier, individually and in her capacity as District Director of DHS ("Mosier"), Eugene Gissandaner, individually and in his capacity as Field Analyst of DHS ("Gissandaner"), Sheree Powell, individually and in her capacity as Director of Communications and Community Relations of DHS ("Powell"), Calvin Kelly, individually and in his capacity as Region Three Deputy Director of DHS ("Kelly"), Jamie Majors, individually and in her capacity as Foster Care and Adoption Program Field Administrator of DHS ("Majors"), Tricia Howell, individually and in her capacity as Deputy Director of Foster Care and Adoptions of DHS ("Howell"), Mallory Poplin, individually and in her capacity as Child Protective Services Supervisor of DHS ("Poplin"), Amy Whitson, individually and as Region One Deputy Director of DHS ("Whitson"), David Clifton, individually and as the Region Five Deputy Director of DHS ("Clifton"), Stephanie Hailey, individually and as Child Welfare Supervisor of DHS ("Hailey"),

3

**EXHIBIT 8**

Daryl Johnston, individually and as District Director of DHS ("Johnston"), and Karen Feather, individually and as Child Welfare Supervisor of DHS ("Feather") (collectively, "Defendants").

Plaintiffs make the following allegations upon personal knowledge as to Plaintiffs' own acts, and upon information and belief and Plaintiffs' attorneys' investigation as to all other matters, alleging as follows:

## I.     NATURE OF THE ACTION

1.     This is a class action brought by former employees of DHS on behalf of two separate classes of current and former employees of DHS.

2.     First, Plaintiffs, on behalf of themselves and the other members of the "Pinnacle Class," as defined herein, assert that they were subjected to unfair and oppressive working conditions in violation of The Oklahoma Pinnacle Plan ("Pinnacle Plan"). The Pinnacle Plan is a contractual promise made by DHS to improve the conditions within DHS. It resulted from a settlement in *D.G., et al. v. Yarbrough, et al.*, Case No. 4:08-cv-000074 (N. Dist. Okla.) that ended the lawsuit seeking to remedy dangerous failures within DHS, which affected not only the children and families who DHS purports to serve, but also employees. Indeed, the Pinnacle Plan addresses 15 performance areas and mandates certain caseload and other standards for the protection and benefit of DHS employees, including Plaintiffs and the Class members, but also is meant to protect the children and families who DHS serves.    Plaintiffs and the other Class members are intended third-party beneficiaries of the Pinnacle Plan.

3.     Second, Plaintiffs, on behalf of themselves and the "Speech Class," as defined herein, allege that they were terminated, constructively terminated, or otherwise retaliated against by DHS for speaking out about matters of public concern, including the unsafe, unfair, and oppressive working conditions within DHS, which not only violated the Pinnacle Plan and Federal

4

**EXHIBIT 8**

and State law, but created an abusive and unsafe environment for DHS employees, and the aforementioned children and families of Oklahoma. These retaliatory terminations and other retaliatory actions violate the First Amendment to the United States Constitution and Article 2, Section 22 of the Oklahoma Constitution.

4.      But the State of Oklahoma and DHS have failed to make good on their promises to Plaintiffs and the other Pinnacle Class members. The Supreme Court also recently told the State of Oklahoma that it could not break its promises just because keeping those promises is difficult or inconvenient, "reject[ing the] thinking" that, "promises were made, but the price of keeping them has become too great, so now we should just cast a blind eye." *McGirt*, 2020 WL 3848063, at *21. Likewise, Oklahoma's ongoing failure to fully and effectively implement the Pinnacle Plan must be rejected.

5.      DHS breached its contract with Plaintiffs and the other Pinnacle Class members by forcing them to work under conditions that violated the Pinnacle Plan. For example, caseloads often exceed ten times the amount allowed under the Pinnacle Plan. This has resulted in an abusive and hostile work environment for Plaintiffs and the other Class members who lacked resources to do their jobs and has led to a culture of blame and sweeping issues under the rug.

6.      When Plaintiffs and the other Speech Class members spoke out against these abuses and violations that affected not only them, but children and families, they were punished and were actually or constructively discharged from their employment with DHS.

7.      Plaintiffs, on behalf of themselves and the other Pinnacle Class and Speech Class members, bring this class action lawsuit for injunctive and declaratory relief, compensatory and punitive damages, garden variety emotional distress, attorneys' fees and costs, and all other

**EXHIBIT 8**

available remedies, resulting from DHS's breaches of the Pinnacle Plan and its retaliation against those who opposed the breaches and other dangerous, unlawful, and abusive practices at DHS.

## II.    PARTIES

### A.    *Plaintiffs*

8.      Dawn Bolt is a citizen of the State of Florida. She was a Child Welfare Specialist in the Child Welfare Services Division of DHS from April 16, 2012 until her constructive discharge on September 30, 2018. At the time of her employment she was a citizen of Oklahoma.

9.      Heidi Stingley is a citizen of the State of Oklahoma and a resident of Oklahoma County, Oklahoma. She was terminated from her employment as a Child welfare Specialist IV in DHS's Child Welfare Services Division on or around June 8, 2018.

10.     Dahn Gregg is a citizen of the State of Oklahoma and a resident of Cleveland County, Oklahoma. She worked as a Program Field Representative with DHS during the time period relevant to the Complaint until her termination on May 21, 2018.

11.     Shawna Burley is a citizen of the State of Oklahoma and a resident of Oklahoma County, Oklahoma. She was hired as a Child Support Worker with DHS in October 2010 and was constructively discharged in or around October 2018.

12.     Glenda Simpson is a citizen of the State of Florida. At the times relevant she was a citizen of the State of Oklahoma. She worked as a Child welfare Specialist III in the Child Welfare Services Division of DHS in Region One, Canadian County, from January 1, 2013, until she was wrongfully discharged by DHS on October 3, 2017.

13.     Kim Keller is a citizen and a resident of the State of Oklahoma. She worked as a Child Welfare Specialist II for DHS in Region Five, Delaware County, from August 2013 until she was constructively discharged on June 19, 2019.

## EXHIBIT 8

14.     Nicholas Brown is a citizen and a resident of the State of Oklahoma.  He worked as a Child Welfare Specialist III for DHS in Region Five, Delaware County, during the time period relevant to this Complaint until he was constructively discharged on January 18, 2019.

15.     Lord Vincent Crutcher is a citizen and a resident of the State of Oklahoma.  He worked as a Child Welfare Specialist II in Child Protective Services for DHS in Region 3, Oklahoma County, from June 2018 through approximately June 7, 2020 when he was wrongfully discharged by DHS.

16.     Crutcher was a former foster child and was in foster care in Oklahoma from 2003 through 2008.  It was his experiences in the Oklahoma Child Welfare System which caused him to pursue a career in child welfare and protection. It was also his experiences as a foster child which caused him to speak out about the ongoing failures of the system he observed while working with and for DHS.

17.     Plaintiff Crutcher and his siblings were putative class members in *D.G., et al. v. Yarbrough, et al.*, Case No. 4:08-cv-000074 (N. Dist. Okla.).

18.     Plaintiffs were each at-will employees during their employment with DHS.

**B.     *Defendants***

19.     DHS is one of the largest agencies of the State of Oklahoma.  It operates state-wide, including in Oklahoma County.  DHS provides a wide range of assistance programs to help Oklahomans in need including: food benefits (SNAP); temporary cash assistance (TANF); services for persons with developmental disabilities and persons who are aging; adult protective services; child welfare programs; child support services; and child care assistance, licensing and monitoring. DHS also handles applications and eligibility for Sooner Care, the state's Medicaid program offering health care to families with low incomes.

**EXHIBIT 8**

20.    As stated by the Child Welfare Services Division, its purpose is to improve the safety, permanence and well-being of children and families involved in the Child Welfare system through collaboration with families and their community.  Programs of the Division include adoption services, child protectives services, criminal history background checks, family centered services, fingerprinting, foster care, independent living, Oklahoma children's services, permanency planning, and social security benefits for custody children.

21.    Defendant Justin Brown is the Director of DHS and has been in his role since on or around June 2019.  As Director, Brown is responsible for implementing policies and procedures and running the Department. Director Brown is the successor to Defendant Ed Lake.  On information and belief, this includes responsibility for implementing and enforcing the Pinnacle Plan as well as for making and enforcing employment policies, including with respect to terminations of employment.

22.    Defendant Ed Lake is the former Director of DHS and was in that role from in or around 2012, until in or around June 2019.  As Director, Lake was responsible for implementing policies and procedures and running the Department.  On information and belief, this included responsibility for implementing and enforcing the Pinnacle Plan as well as for making and enforcing employment policies, including with respect to terminations of employment.

23.    Defendant Deborah Shropshire is the Director of the Child Welfare Services Division of DHS and has been in her role since in or around June 2019.  As Director, she is responsible for implementing policies and procedures and running the Division.  On information and belief, this includes responsibility for implementing and enforcing the Pinnacle Plan, as well as decisions regarding terminations, and the working conditions and environment within the Division.

**EXHIBIT 8**

24.     Defendant Jami Ledoux is the former Interim Director and former Director of the Child Welfare Division of DHS. She was Interim Director from in or around August 2014 until in or around August 2015 and was Director from in or around August 2015 until in or around May 2018. On May 16, 2018, Ledoux announced her resignation as the head of the Child Welfare Services Division for DHS citing the stress of her job and the pressure of implementing the Pinnacle Plan. As Interim Director and Director, Ms. Ledoux was responsible for implementing policies and procedures and running the Child Welfare Services Division. On information and belief, this included responsibility for implementing and enforcing the Pinnacle Plan, as well as decisions regarding terminations, and the working conditions and environment within the Division. Ledoux was rehired as the Chief of Innovation for DHS on July 22, 2019.

25.     Defendant Sheree Powell is the Director of Communications and Community Relations at DHS. Powell oversees the Offices of Communications, Community and Faith Engagement, and Information and Referral. The Office of Communications conveys the DHS mission and informs the public, media and other groups about programs, services and accomplishments of the agency. This office oversees the DHS website, social media presence and ensures employees are fully informed through various internal communications and trainings. The Office of Community and Faith Engagement promotes collaboration with private, nonprofit, government and faith groups to maximize department resources and effectiveness. This office supports volunteerism as a means of improving outcomes for the people DHS serves. The Office of Information and Referral supports the Director of Human Services by handling calls and emails from clients, foster parents, contract providers, legislators, and other external customers. On information and belief, this includes responsibility for implementing and enforcing the Pinnacle

9

**EXHIBIT 8**

Plan, as well as decisions regarding terminations, and the working conditions and environment within the Department.

26.     Defendant Calvin Kelly was the Region Three Deputy Director of DHS and was responsible for overseeing or supervising Defendants Mosier and Gissandaner and Plaintiffs Bolt, Stingley, Burley, Gregg, and Crutcher.

27.     Defendant Amy Whitson was the Region One Deputy Director of DHS which includes Canadian County, and was responsible for overseeing or supervising Defendant Poplin and Plaintiff Simpson.

28.     Defendant David Clifton was the Region Five Deputy Director of DHS and was responsible for overseeing or supervising Defendants Feather, Hailey and Johnston and Plaintiffs Keller and Brown.

29.     Defendant Tricia Howell is the current Assistant Child Welfare Director for Program Operations and former Deputy Director of Foster Care and Adoptions at DHS.  During the time period relevant to this complaint, she was responsible for overseeing or supervising Defendant Majors and Plaintiff Gregg.

30.     On information and belief, the job of the Deputy Director is to direct and coordinate all of the services provided by the Child Welfare Services Division and the associated agency operations including but not limited to Child Protective Services, Family Centered Services, and Permanency Planning Services; and resolves problems and participates in the implementation of the program plan and policies, cooperating with District Directors, and other Child Welfare leaders.  The role of the Deputy Directors is to ensure compliance with the state and agency missions, goals, priorities, vision, and values through collaboration with all levels of management from the top to bottom of the agency and to work as a liaison between the Regions and the Director

10

**EXHIBIT 8**

of the Child Welfare Services Division and the Director of DHS.  On information and belief, this includes responsibility for implementing and enforcing the Pinnacle Plan, as well as for decisions regarding terminations, and the working conditions and environment within the Department.

31.    On information and belief, the role of the Deputy Director for Foster Care and Adoptions at DHS is similar to that of a Deputy Director of a Region except that this role has a specific focus on the placement of children for permanency in foster care and adoption situations. On information and belief, this includes responsibility for implementing and enforcing the Pinnacle Plan, as well as decisions regarding terminations, and the working conditions and environment within the Department.

32.    Defendant Jami Majors was the Foster Care and Adoption Program Field Administrator at DHS and was a supervisor for Plaintiff Gregg.  In her role as the Foster Care and Adoption Program Field Administrator she reviewed and approved child placement for adoption and foster care.  On information and belief, this included responsibility for implementing and enforcing the Pinnacle Plan, as well as decisions regarding terminations, and the working conditions and environment within the Department.

33.    Defendant Eugene Gissandaner is the Administrative Field Analyst for Region Three of DHS.  Gissandaner was a supervisor for Plaintiffs Bolt, Stingley, Burley, Gregg, and Crutcher.  On information and belief, the Administrative Field Analyst directs and coordinates programs for the Child Welfare Services Division to comply with federal and state regulations and guidelines, implements policies, rules and regulations for child welfare, analyzes and evaluates program effectiveness through quality assurance activities, plans, supervises and coordinates staff activities; selecting, managing, evaluating staff, assessing staff needs, training, assigning work, using staff effectively and establishing standards of performance. On information and belief, this

11

**EXHIBIT 8**

included responsibility for implementing and enforcing the Pinnacle Plan, as well as decisions regarding terminations, and the working conditions and environment within the Department.

34.     Defendant Tanya Mosier is a District Director for Region Three of DHS, Oklahoma County. During the time period relevant to this complaint she has been a District Director and was a District Director over Plaintiffs Bolt, Stingley, Burley and Crutcher.

35.     Defendant Daryl Johnston is or was a District Director for DHS in District 13 which includes Delaware and Ottawa Counties. During the time period relevant to this complaint he was a District Director for Plaintiffs Keller and Brown.

36.     On information and belief, a District Director is responsible for directing and managing all aspects of Child Protective Services, Family Centered Services and Permanency Planning programs and activities.  The District Director directs and supervises Child Welfare Specialist IV's and other subordinate staff to ensure workforce quality, competence, service delivery and compliance with law, policy and procedures. On information and belief, this included responsibility for implementing and enforcing the Pinnacle Plan, as well as decisions regarding terminations, and the working conditions and environment within the District.

37.     Defendant Mallory Poplin was a Child Welfare Supervisor or CWS IV for DHS in Canadian County and acted as a supervisor for Plaintiff Simpson.

38.     Defendant Stephanie Hailey is or was Child Welfare Supervisor or CWS IV in Delaware County and acted as a supervisor for Plaintiff Keller.

39.     Defendant Karen Feather is or was Child Welfare Supervisor or CWS IV in Delaware County and acted as a supervisor for Plaintiff Brown.

40.     On information and belief, a Child Welfare Supervisor or a CWS IV is tasked with providing direct supervision to one CWS III and four CWS I-II.  Supervisors train, direct,

12

## EXHIBIT 8

coordinate, evaluate, and prioritize the work of those under supervision. Supervisors manage tracking systems created to monitor work assignment, turnover, staff experience and case evaluation. On information and belief, it is the job of the Supervisor to assures compliance with Federal and State Law and agency policy and to hold monthly meetings with staff to discuss individual cases, training, and development.

41. On information and belief, each and every individual Defendant had as an element of responsibility in their jobs with the Department and an obligation to ensure that the Department acted in compliance and good faith with the Pinnacle Plan and to ensure compliance with State and Federal law and Departmental policy in the care, investigation, and placement of children of Oklahoma alleged to be the victims of abuse or neglect and to whom allegations of abuse and neglect were reported. Each Defendant had an obligation as an individual and as a professional to report and investigate abuse and neglect and ensure that children were placed in safe environments within the confines of the law. Each Defendant also had responsibility for decisions regarding terminations, and the working conditions and environment within DHS.

42. At all times relevant to the complaint, the Individual Defendants were acting under color of state law.

### III. JURISDICTION AND VENUE

43. This Court has personal jurisdiction over Defendants because they are citizens of Oklahoma and committed many of their wrongful acts and omissions in Oklahoma County, Oklahoma.

44. Venue is proper in Oklahoma County pursuant to 51 O.S § 163(A).

### EXHIBIT 8

## IV.    FACTUAL ALLEGATIONS

### A.    *The Pinnacle Plan*

45.    The Pinnacle Plan is a settlement and plan for the recovery of the DHS child welfare system as a result of a civil rights class action lawsuit that was filed against DHS in the United States District Court for the Northern District of Oklahoma in or around 2008.

46.    As part of the settlement terms, in or around 2012, the Pinnacle Plan was put into place to improve both the conditions for children and families within the Child Welfare system, as well as for the employees.  By directly addressing the working conditions of the employees within the Child Welfare Division, the conditions would improve for the workers, who would be able to better perform their jobs.

47.    One way that the Pinnacle Plan aims to improve working conditions for employees within the Child Welfare Services Division, including Plaintiffs and the other Pinnacle Class members, is by limiting the caseload of workers to ensure that they have adequate time, training, and resources to protect the children referred to DHS.

48.    The Pinnacle Plan set the following caseload standards for Year One of the plan:

 a.   Child Protective Services: no more than 12 open investigations and/or assessments per worker.

 b.   Office of Client Advocacy (OCA) (conducting investigations for children in out of-home placements): no more than 12 open investigations per worker.

 c.   Family-Centered Services: no more than eight families per worker.

 d.   Permanency Planning: no more than 15 children per worker.

 e.   Resource: no more than 22 resource families per worker. If resource staff is responsible for completing resource family assessments, the workload standard will

## EXHIBIT 8

be decreased accordingly, subject to the review and approval of the Co-Neutrals appointed to monitor compliance with the Pinnacle Plan.

f.   Adoption: no more than eight families and eight children per worker.

49.   A settlement agreement to end a lawsuit is a contract.

50.   On information and belief, DHS has the authority to enter into a contract for and/or on behalf of the workers with the agency in regard to the agreed performance of work standards.

51.   On information and belief, Child Welfare Workers were direct and intended beneficiaries of the settlement contract entered into by DHS.

52.   DHS then adopted the terms and conditions of the settlement for workload standards into its policies and procedures for protecting Children and Workers.

53.   These standards are to remain in place throughout the life of the Pinnacle Plan. Because the goals of the Pinnacle Plan were never met, they remain in place to this day, and have been in place throughout the time period relevant to this Complaint.

**B.  *DHS Violates the Pinnacle Plan as Well as State and Federal Law, Negatively Impacting the Working Environment of Plaintiffs and the other Class members***

54.   During the time period relevant to this complaint, DHS continuously violated the caseload standards imposed by the Pinnacle Plan, as well as other aspects of the Plan.

55.   For example, during the time period relevant to the Complaint:

a.   DHS often assigned up to 60 or more cases to individual workers, who should have been assigned no more than 12 cases;

b.   Oklahoma City, the largest city in the state, should have had 90 workers in order to meet the requirements of the Pinnacle Plan, but had only 30-40 at any given time;

c.   Supervisors who should have supervised 5 or 6 workers with 12 cases each (for a total of 60 to 70 cases), were instead supervising workers who themselves were

**EXHIBIT 8**

assigned to 60 or more cases, such that the supervisors' workload was 5-6 times greater than it should have been;

d.  Workers were directed to close a certain number of case investigations per week or else they would be written up, regardless of whether the case had been properly investigated;

e.  Workers were not given adequate resources to care for children in the DHS system, such that children were left in unsafe situations; and

f.  Defendants made decisions, not based on the best interest of children and families, but in the interest of keeping numbers low to make it look as if DHS was in compliance with the Pinnacle Plan.

56.     These specific violations of the Pinnacle Plan are provided by way of example only. Further violations will be identified and developed through discovery and as the case proceeds.

57.     The violations of the Pinnacle Plan by DHS and the Individual Defendants also violate the mandates for child welfare as set forth by Federal and State law, including but not necessarily limited to: Title IV-E and Title IV-B of the Social Security Act, as amended, and supported through such legislation and acts by Congress as the Family First Prevention Services Act of 2018, the Every Student Succeeds Act of 2015, McKinney-Vento Act, the Preventing Sex Trafficking And Strengthening Families Act of 2014, the Fostering Connections to Success and Increasing Adoptions Act of 2008, the Child and Family Services Improvement Act of 2006, the Adam Walsh Child Protection and Safety Act of 2006, Safe and Timely Interstate Placement of Foster Children Act of 2006, the Adoption Promotion Act of 2003, the Keeping Children and Families Safe Act of 2003, the Child Abuse Prevention and Enforcement Act of 2000, the Adoption and Safe Families Act of 1997, the Indian Child Welfare Act, the Fourteenth

16

**EXHIBIT 8**

Amendment of the United States Constitution, the Oklahoma Constitution, Titles 10 and 10A of the Oklahoma Statutes, the Oklahoma Administrative Code, Title 340, and DHS policy and procedure.

58.     Federal Administration after administration, Congress after Congress, and State after State have passed legislation appropriating funds and dictating the obligation of Oklahoma and DHS to take action to protect children.

59.     The law mandates that DHS and the State of Oklahoma take action and DHS and the State promised every Oklahoman, specifically the workers, and the children, through the adoption of the Pinnacle Plan that they would make our children and families safe and create a working environment where employees were empowered to fulfill that mandate.

60.     DHS broke its promise to the children and broke its promises to Plaintiffs and the other Pinnacle Class members.

61.     These broken promises and violations of the Pinnacle Plan put not only the youth, children, and families served by DHS in harm's way, but also affected workers, including Plaintiffs and the other Class members, who could not possibly safely and thoroughly perform their jobs. The abusive and oppressive working conditions caused harm to Plaintiffs and the other Class members, who were forced to perform their jobs under circumstances that made it impossible for them to do so.

62.     Eventually these violations of the Pinnacle Plan caused some of the Plaintiffs and other Class members to suffer mental health issues, exhaustion, stress, emotional distress, and other negative symptoms caused by overwork and a toxic working environment.

63.     Many if not all of the Plaintiffs were forced to use Family Medical Leave Act ("FMLA") benefits and/or compensatory time to deal with these symptoms caused by overwork

**EXHIBIT 8**

and a toxic working environment, including violations of the workload standards of the Pinnacle Plan. However, when seeking to use these benefits which were theirs by right of working for DHS, the management and staff would continue to harass, demean, embarrass, and threaten the workers over taking the benefits that they earned and would retaliate against the workers during their leave and on their return. This was particularly so for Class members who challenged Defendants' unlawful and abusive practices.

64.     Speaking out against the agency was at risk of peril of job security and performance and the threat of discipline hung over the employees' heads like a guillotine always ready to strike a deadly blow

65.     When Plaintiffs and other Speech Class members spoke out about these violations and other harmful and illegal practices at DHS, they were fired or otherwise retaliated against through the creation of a hostile work environment, denial of benefits, including FMLA leave, accommodations under the Americans with Disabilities Act ("ADA"), rights and benefits afforded by the Uniformed Services Employment and Reemployment Rights Act ("USERRA") and other State and Federal laws, and the right to utilize earned benefits like comp time or paid time off. When Plaintiffs and the other Class members were allowed to take leave they were subject to having co-workers and superiors alter or sabotage reports and investigations, and subject them to punitive work assignments, including remaining on assigned to cases long after they left the employ of the State.

**C. *Facts Relating to Individual Plaintiffs: After Engaging in Protected Speech, Plaintiffs Were Retaliated Against***

66.     Each of the Plaintiffs and Pinnacle Class members was forced to work under conditions that violated the Pinnacle Plan and State and Federal law.

18

**EXHIBIT 8**

67.     At various times during their employment, because of the aforementioned violations of the Pinnacle Plan and State and Federal law, Plaintiffs each exercised their rights under the First Amendment to the United States Constitution and Section 2, Article 22 of the Oklahoma Constitution, by speaking out regarding the conditions within DHS.

68.     They spoke out as private citizens, not as part of their official job duties.

69.     The conditions within DHS are a matter of public concern because of the community and societal importance of protecting the children and families of Oklahoma and ensuring that DHS complies with Federal and State law and its promises.

70.     At various times during their employment, because of the aforementioned violations of the Pinnacle Plan and State and Federal law, Plaintiffs each exercised their rights under the Fourteenth Amendment to the United States Constitution to obtain substantive due process and participate in the judicial system to assert the failures of DHS to protect the rights of children and the rights of the workers under the Pinnacle Plan, State and Federal laws, and Departmental policy and procedure.

71.     Other members of the Speech Class also exercised their rights under the First Amendment to the United States Constitution and Section 2, Article 22 of the Oklahoma Constitution, and the Fourteenth Amendment to the United States Constitution.

72.     During the relevant time period DHS, through Defendants the Individual Defendants, implemented a *de facto* policy and practice of getting rid of those who spoke out against DHS and refused to conform with the agency's failures to protect children, families and workers.

73.     This *de facto* policy and practice at DHS of terminating those who spoke out applied equally to Plaintiffs and to all members of the Speech Class.

**EXHIBIT 8**

74.     Management at DHS would threaten workers with discipline if they spoke out against DHS. This was consistent with and part of DHS's *de facto* policy and practice of silencing workers who spoke out. In implementing this policy, one District Director told her subordinates that "If I ever receive an email, a phone call, or any other notification that you or a member of your staff talked poorly, unprofessionally, harshly, or blames another person within DHS, to an outside party, I will use disciplinary action. That is SO unprofessional and will not be tolerated. We have to earn trust by showing teamwork, cohesiveness, loyalty and support of our peers to ALL outside parties. I do not care if it is the ADA, the Judge, or the jury. You will handle differences with your peers internally and by utilizing the chain of command. When you speak about your work, you represent the department, not yourself. Please ensure your staff understand this! Does everyone understand?" This type of threat and intimidation was the norm at DHS and not the exception. All levels of management and leadership within the agency managed with threats, intimidation and coercion rather than compliance, support and professionalism, consistent with the policy to silence those who spoke out as citizens about DHS's wrongful acts.

i.   *Plaintiff Dawn Bolt*

75.     Throughout her employment, Bolt voiced her concerns inside and outside DHS about violations of the Pinnacle Plan, her co-workers being overworked, children being placed in harm's way because of extreme caseload demands, and the inability of workers to address concerns and perform their jobs diligently because of these issues.

76.     Bolt was also an active and vocal supporter of DHS employees, Plaintiffs Stingley, Burley, and Gregg, and, Holly Goralewicz, another DHS employee, both within and outside DHS.

77.     Beginning in 2017 when Stingley, Burley, Gregg, and Goralewicz, continued to speak out through the media regarding the conditions at DHS, Bolt continued to voice her support

**EXHIBIT 8**

for them both inside and outside of DHS, and to raise her own concerns regarding DHS leadership. By this point, Bolt, as well as Stingley, Burley, and Gregg, and Goralewicz were represented by Rachel Bussett one of the undersigned counsel. DHS associated Bolt with the other employees and Bussett Legal Group and retaliated against her accordingly for their protected speech.

78.     Bolt's Supervisor Debi Knecht even went so far as to confront Bolt about a story that Bussett, who is also a member of the press, wrote about working with DHS. Knecht told Bolt that she knew it was about her and took retaliatory action against Bolt because of her association with Bussett and the others.

79.     Plaintiff Bolt was constructively discharged when she submitted her written resignation to DHS on September 30, 2018. After years of trying to speak out and have her voice heard regarding the ongoing, and blatantly illegal activity at DHS that affected workers, children, and families, she was no longer able to endure the emotional stress of working at DHS. She had been the victim of ongoing and repeated harassment, discrimination, and bullying as a result of her speaking out against the conditions at DHS, and because of other protected activity. Over the years, Plaintiff Bolt had attempted to remedy these troublesome issues, including filing a lawsuit, but when the situation did not improve, she was left with no choice but to resign her employment.

### ii.  Plaintiff Heidi Stingley

80.     In January 2017, Plaintiff Heidi Stingley was assigned to a child welfare investigation on S.C. and her siblings. The investigation in this instance was focused on the mother's drug use and there were no allegations of medical neglect. However, this family had been investigated on many previous occasions and S.C. was a child known to the system to be the victim of medical neglect by her mother due to the mother's associated drug use.

**EXHIBIT 8**

81.     Six months prior to Stingley's assignment to S.C., another Region Three team investigated S.C. and her siblings over medical neglect. DHS closed that case without ensuring that the mother completed all her services for drug use and did not bring the children into custody.

82.     Plaintiff Stingley wanted to bring S.C. into custody but was overruled by Defendant Mosier. Defendant Mosier has a reputation for refusing to bring children into custody in order to keep her numbers down in an effort to make the Department appear to be in compliance with the Pinnacle Plan.

83.     Pursuant to Mosier's instructions and over her objections, Stingley referred the case of S.C. to Comprehensive Home-Based Services (CHBS) and the child was left placed with the family.

84.     S.C. subsequently died while placed in the family home under the supervision of CHBS due to medical neglect. S.C. died as a result of an asthma attack when the family delayed seeking treatment for her for a period of hours. The death was avoidable and had Mosier not overruled Stingley's decision to bring the child into custody, it is more probable than not that S.C. would be alive today.

85.     In April 2017, Stingley reached out to Oklahoma State Representative Kevin Calvey to discuss her concerns with him about the failures occurring in the Department, including the failure to comply with the Pinnacle Plan and violations of State and Federal law.

86.     In May 2017, Defendants Gissandaner and Kelly called Stingley to their office to investigate the death of S.C. Gissandaner and Kelly lied to Stingley about the purpose of the meetings and Stingley was denied the right to have the attorney, whom she brought to the meeting, present for her interview.

**EXHIBIT 8**

87.     During this meeting in May 2017, Gissandaner and Kelly failed to advise Stingley of her rights under *Garrity v. New Jersey*, 385 U.S. 493 (1967). *Garrity* rights are the right of public employees not to be compelled to incriminate themselves by their employers. By failing to advise her of these rights, Gissandaner and Kelly deprived Stingley of her rights under *Garrity* and the Fifth Amendment to the United States Constitution.

88.     Following this meeting, Gissandaner, Kelly, and Mosier attempted to demote and move Stingley to another position and blame her for the death of S.C. even though Stingley had objected to Mosier's decision not to bring S.C. into custody.

89.     Stingley elected at that time to utilize FMLA to care for her daughter who was having spinal surgery. Stingley was on leave from May 2017 through the end of August of 2017.

90.     In June 2017, Stingley reached out to the DHS Office of Civil Rights to seek assistance from them because she feared retaliation from Kelly, Gissandaner, and Mosier for speaking out against them related to the handling of the case of S.C. and Mosier's refusal to bring S.C. and her siblings into DHS custody.

91.     On June 12, 2017, after Stingley could not get assistance from the DHS Office of Civil Rights, she wrote directly to Defendant Lake and advised him that she believed she would be retaliated against for speaking out against DHS and its leadership for the failings that led to the death of S.C.

92.     In June 2017 fearing further retaliation by DHS, Stingley retained Rachel Bussett and the Bussett Legal Group to represent her related to her employment.

93.     At the same time Stingley retained Bussett, Bussett was also retained by Burley and Goralewicz who had similar experiences and concerns as Stingley about the failure of DHS to

**EXHIBIT 8**

abide by the Pinnacle Plan and State and Federal law and the failure to bring at risk, abused, and neglected children into custody.

94.     In August of 2017, Stingley and Bussett met with Gissandaner and Mosier to address the discipline that DHS determined that Stingley should receive for her role in the handling of S.C.'s case.  Stingley was given the opportunity to respond to her discipline.  In doing so Stingley advised she gave counsel documents which substantiated her allegations that DHS regularly and routinely failed to abide by State and Federal law and the Pinnacle Plan.

95.     After Stingley advised that she had given counsel proof of DHS's failures and legal violations, DHS ran down a path of further legal violations, threats, and intimidation which included threatening counsel with civil and criminal prosecution and a bar complaint, threatening Stingley with termination and civil and criminal prosecution, the issuance of subpoenas, and ultimately naming her counsel as a witness in the termination case against Stingley.

96.     In September 2017, DHS continued its pattern of harassment and intimidation of Stingley by filing a bar complaint with the Oklahoma Bar Association when counsel refused to break privilege and advise whether Stingley had given her any documents.  Counsel was cleared by the Bar Association of any wrongdoing.

97.     On September 14, 2017, Stingley filed an Intake Questionnaire at the Equal Employment Opportunity Commission ("EEOC") bearing file number 564-2017-01529 with the Oklahoma City EEOC office. Stingley alleged that she had been speaking out against DHS since the Pinnacle Plan was implemented about staffing shortages, unreasonable and illegal work demands, an improper demotion and retaliation following the death of S.C., disability discrimination, FMLA complaints and DHS's overall retaliation against her as an employee.

**EXHIBIT 8**

98.     On September 14, 2017, Bussett, Stingley, and Podolec met with DHS Assistant General Counsel John Langford to discuss the documents that Stingley had given to Bussett. At the meeting Bussett presented Langford with the EEOC complaint filed that day on Stingley's behalf.

99.     At the meeting Bussett and Podolec were prepared to present Stingley to discuss the documents she had given to Bussett, but Langford refused to administer Stingley's *Garrity* rights. Further, Langford did not appear to understand what Garrity rights were or why he was required to administer them before speaking to an employee who allegedly engaged in wrongdoing even though Langford had previously sent threats of legal action against Bussett and Stingley over the documents. This was another effort to violate Stingley's constitutional rights under the Fifth Amendment to the United States Constitution and a further attempt to deter counsel for representing Stingley by threatening to file a complaint with their licensure board and to pursue civil and criminal matters against the employee and her counsel. This shows the depths that DHS will go to prohibit outsiders from finding out about the agency's broken promises.

100.    After the meeting, Langford filed his bar complaint wherein he admitted to receiving the EEOC document, that he refused to administer *Garrity* rights and that he refused to allow Ms. Podolec who also represented the parties to be present for the interview.

101.    In October 2017, Plaintiff Stingley, along with Plaintiff Burley, and another DHS employee, Holly Goralewicz, spoke out through the media regarding the conditions at DHS. Stingley's interview aired first in October of 2017, and an interview of Stingley, Burley and Goralewicz all aired in November of 2017.

102.    In between the airing of the two interviews, Bussett filed the first lawsuit on behalf of Plaintiff Dawn Bolt against DHS.

**EXHIBIT 8**

103. Two days after Stingley's interview in October aired, Stingley was placed on paid administrative leave where she remained until her pre-termination hearing in June 2018.

104. In November 2017, DHS issued subpoenas under their new Office of Inspector General Subpoena Power to obtain the documents that Stingley had given to counsel.

105. Counsel filed to quash the subpoena and was ordered to produce a privilege log of the documents to DHS. Ultimately the Court ordered that counsel had to provide a copy of the documents that Stingley had given to counsel but the Court did not order counsel to destroy the documents or make any finding that Stingley had wrongfully taken documents or provided them inappropriately to counsel.

106. In June 2018, Plaintiff Stingley was terminated from DHS in retaliation for speaking out publicly against DHS and hiring an attorney to represent her and investigate the allegations into DHS. Specifically, just days after she made statements to the local media that were critical of DHS, she was placed on an indefinite suspension with pay. Plaintiff Stingley was not provided any reason for the suspension and was ultimately terminated on or around June 8, 2018.

### iii. *Plaintiff Dahn Gregg*

107. Dahn Gregg was an employee of DHS from 2005 through her termination in May 2018.

108. During her tenure at DHS, Gregg worked in many areas for the agency including permanency planning, child welfare, the Laura Dester Shelter and as the Program Field Representative for Foster Care and Adoption.

## EXHIBIT 8

109.    During her tenure with DHS, Gregg was assigned to the Serenity Deal case and knew the facts and circumstances that lead to the death of Serenity Deal due to the negligence of DHS.

110.    In June 2011, Serenity Deal died while in DHS custody after DHS placed her with her father who had a history of abuse allegations against him. Deal was brutally beaten to death. Two former child welfare workers were charged with suppressing evidence in the case including the evidence which would have prevented her placement in the home with her father. One DHS worker committed suicide. An investigation was done into this case and there was severe wrongdoing on the part of DHS. DHS settled a wrongful death lawsuit with the grandparents of Serenity Deal in February 2018, at the same time as when Gregg was actively speaking out as a citizen against the agency.

111.    Serenity Deal was a putative class member in the case of *D.G., et al. v. Yarbrough, et al.*, Case No. 4:08-cv-000074 (N. Dist. Okla.).

112.    During her employment with DHS Gregg spoke out against wrongdoing in multiple placements but specifically the death of Serenity Deal, about her tenure with the Laura Dester Shelter, and about her experiences as a Program Field Representative for Foster Care and Adoption.

113.    After speaking out about an incident involving a child being handcuffed at the Shelter, Gregg was demoted to an unclassified position and transferred to Foster Care and Adoption.

114.    Gregg was the only Program Field Representative for DHS that was an unclassified employee.

27

**EXHIBIT 8**

115.     Gregg requested on several occasions to be changed back to a classified employee, but the agency refused to remove her discipline and restore her classified status.

116.     In November of 2017, Plaintiff Gregg reached out to the Bussett Legal Group and retained the firm to represent her in relation to retaliation Gregg experienced while working at DHS and the agency's failure to comply with the Pinnacle Plan and protect children.  In December of 2017, Gregg hired Bussett Legal and Gregg began making her affiliation and relationship with Bussett, Stingley, Burley, Bolt and Goralewicz public knowledge through social media and by speaking to her co-workers and encouraging them to come forward about what was happening within the agency.

117.     On February 12, 2018, Gregg filed an intake Questionnaire with the EEOC, File No. 564-2018-0861, alleging discrimination on the bases of sex, retaliation and age which also discussed and set forth her claims of speaking out against wrongdoing against DHS.

118.     After engaging the services of an attorney, Gregg reached out to her counterpart Katrina Welch a/k/a Katrina Smith and encouraged Smith to come forward about her experiences with DHS and its failure to abide by the Pinnacle Plan.  Smith feared for her job and refused to come forward.

119.     However, Smith advised Defendants Howell and Majors, who were the supervisors for Gregg and Smith, that Gregg had retained counsel and was speaking out about the failings of DHS.

120.     Smith also told her husband about Gregg's activities and that she had told their bosses of Gregg's intent to reveal DHS confidences.

28

## **EXHIBIT 8**

121. During this time, Gregg continued telling her supervisors, Majors and Howell, about her concerns over placement of children in unsafe homes due to past criminal activity and convictions and the inability of the families to support the children.

122. Majors and Howell and others would ignore her concerns and instead tell her that she was being too "nit-picky" about placements and to do her job. Majors and Howell never gave clarification on how Gregg was being "nitpicky" and continued to refuse to elaborate or help Gregg do better at her job.

123. In March 2018, Dahn Gregg gave an interview with the same news reporter who interviewed Burley, Goralewicz, and Stingley. On information and belief, the reporter reached out to DHS for a quote about Gregg's interview. However, the interview never aired due to the teachers' strike which was occurring at the Capital at the same time.

124. The matters which Plaintiff Gregg discussed with the reporter and others include, but are not limited to;

   a. Placing children in homes with documented previous child welfare history, criminal history, sexual offender history, and concerning home study information;

   b. Placing children in homes where one or both parents are unable to care for the children without the assistance of the DHS Foster Parent Stipend;

   c. Placing children in homes that are not equipped to provide proper care for children with special needs without the support of DHS; and

   d. Placing children in homes with potential foster or adoptive parents who have Big 5 violations which prohibit the placement of foster children.

29

**EXHIBIT 8**

125.    On May 8, 2018, the Tenth Circuit Court of Appeals issued a scathing opinion against DHS and Child Welfare workers in the case of *Matthews vs. Bergdorf*, 889 F.3d 1136, denying qualified immunity for two out of seventeen Child Welfare workers who were sued for failure to investigate allegations of abuse and neglect by Jerry and Diedre Matthews.

126.    Jerry and Diedre Matthews were adoptive and foster parents for DHS in Delaware[1] County, Oklahoma.  Delaware County was one of the Counties where Dahn Gregg reviewed and approved homes for foster care and adoption placement.

127.    In its opinion, the Tenth Circuit panel said "ODHS and its caseworkers may find solace in the fact that to a large degree they have prevailed on appeal. If so, they are sorely mistaken for no solace is to be found within these written words. Assuming the allegations of the complaint have some basis in fact (and we suspect they may), any layperson would think a court justified in throwing ODHS and its caseworkers 'under the bus.' We too cannot help wondering what is going on at ODHS and its Delaware County office that would allow this undeniable tragedy to extend over a period of several years, a tragedy that resulted in unspeakable and perhaps irreparable harm to the children and the criminal convictions of both Jerry and Deidre Matthews." *Matthews*, 889 F.3d at 1153.

128.    Dahn Gregg knew how homes like the Matthews' home happened because she had been speaking out about it for years.

129.    Just like Serenity Deal, the nine children in the Matthews home were putative class members in *D.G., et al. v. Yarbrough, et al.*, Case No. 4:08-cv-000074 (N. Dist. Okla.).

130.    On May 13, 2018, it was reported that Braxton Danker, a child in Lincoln County, died from a subdural hematoma due to a beating by his parents.  On information and belief, DHS

---

[1] Plaintiffs Keller and Brown are DHS workers from Delaware County Oklahoma who spoke out about wrongdoing occurring in this office.

**EXHIBIT 8**

had received referrals alleging abuse and neglect and DHS screened out the allegations and failed to investigate.

131.    Lincoln County and Pottawatomie Counties were within the area of the State where Dahn Gregg was assigned to review cases for placement and she was friends with caseworkers working in that area.

132.    On May 16, 2018, just 8 days after the Matthews opinion was released, Jami LeDoux announced her resignation as the head of the Child Welfare for DHS citing the stress of her job and the pressure of implementing the Pinnacle Plan.

133.    On the same day LeDoux resigned, May 16, 2018, Gregg received an email that children that had been approved for trial adoption were being removed by the permanency worker after it was discovered that the Foster Family was not feeding or caring for the children, that the Foster Family had been evicted from the home, and that the children had been in the care and custody of the biological mother who's rights had been terminated.

134.    On May 18, 2018, Gregg knew that a home she had expressed concern over approving placement due to State and Federal law violations and DHS policy violations, had come to fruition and she sent a long email to Majors and Howell identifying specific facts to support her concerns and included data about maltreatment in care.

135.    Gregg previously objected to approving this home for adoption because the case involved a non-verbal autistic child being placed in a home where the foster parent had no independent means of support beyond governmental assistance, had been relying on relatives to pay bills, and where DHS has had to supplement the family with gift cards and food boxes to stay afloat. Approving this home for adoption was inconsistent with State and Federal law and DHS policy and procedure but she was instructed to approve it anyway.

31

**EXHIBIT 8**

136.     Majors and Howell did not respond to the email which was sent at 11:19 am on Friday May 18, 2020.

137.     Dahn Gregg was terminated from her employment with DHS on the morning of Monday May 21, 2018 with no reason being given for her termination.

138.     At this point Majors and Howell knew from Smith and others that Dahn Gregg would not be quiet about what was happening at DHS. She had spoken out about wrongdoing on at least three occasions and now she had an attorney and a group of people who were also coming forward. Therefore, DHS had to find a reason to terminate her.

139.     Subsequently in 2019, counsel for Gregg learned that the pretextual reason that she was terminated was for allegedly accessing the Braxton Danker case. Gregg was not assigned to the Danker case. However, in her role for DHS Gregg had access to all active cases within DHS unless the case was restricted.

140.     DHS admitted that at the time the Gregg access the case it was not restricted in anyway.

141.     Further, the records show that Gregg was only in the case for a short period of time indicating that she quickly realized that she was looking at the wrong case and moved on to perform her responsibilities.

142.     Gregg was terminated without being asked why she accessed the Danker case, if the access was accidental or intentional, and/or if she had a legitimate reason to access the case. In fact, Gregg had no knowledge of why she was terminated until 2019 during the discovery phase of her Merit Protection Case. When asked about the case later, Gregg had no recollection of accessing the case and assumed that it was a mis-key when otherwise performing her job duties.

**EXHIBIT 8**

143.    Regardless of whether Gregg intentionally or accidently accessed the Danker case file, all child welfare workers can access any case within the system at any time. A worker is not required to be assigned to a case to access it. Further, there are many valid reasons for accessing a case not assigned to a specific worker including accidently entering a case wrong and/or accessing a case on behalf of a co-worker who is in the field and needs case information. The system that DHS uses for tracking cases is quite antiquated and does not work well remotely via VPN access and testimony at the MPC hearing was that workers routinely called each other to look up a case for them while in the field working.

144.    Dahn Gregg was terminated by DHS because she continued to speak out against DHS and its failings, including violations of the Pinnacle Plan and State and Federal law.

### iv. *Plaintiff Shawna Burley*

145.    Throughout her employment with DHS, Plaintiff Shawna Burley also spoke out as a citizen about the unfair and oppressive conditions at DHS which violated the Pinnacle Plan and Federal and State law. In February of 2017, Burley sent an email to Defendant Lake regarding concerns she had about excessive work requirements for workers, which violated the Pinnacle Plan, complaints about District Director Erin Johnson, and concerns that workers were turning to drugs and alcohol as a result of the stressful working environment at DHS.

146.    Lake did not give Burley a substantive response or any assistance.

147.    In the months after Burley sent the email to Lake, a DHS worker was arrested smuggling drugs into the Grady County jail and another DHS worker was arrested for a DUI while under the influence in responding to a child welfare call.

148.    In August 2017, a DHS lawyer was arrested for a DUI related death of a pedestrian.

33

**EXHIBIT 8**

149.    Additionally, during her employment with DHS, Plaintiff Burley was a member of the Army National Guard. Burley had obligations to the guard monthly and annually.

150.    Fulfilling her duties to DHS required Burley to literally be available and on call 24 hours a day 365 days a year and DHS did not like when her obligations to the Guard interfered with her ability to act as a Child Welfare Worker.

151.    Burley was routinely threatened over her obligation to continue to perform her DHS obligations even when she was unavailable due to her commitment to the National Guard.

152.    Monthly and annually when Burley would take leave for her Guard commitment, DHS would retaliate against her and threaten her about her time away from the office.

153.    Burley was forced to perform her DHS job duties due to threats of discipline and retaliation about falling behind while she was serving in the guard. This is a violation of the Uniformed Services Employment and Reemployment Rights Act.

154.    Burley continued to speak out to others both within and outside the agency about the failure of the Department to protect children and the unreasonable workload demands that the Department put on employees.

155.    In October 2017, Burley, along with Stingley and Goralewicz spoke with the media concerning unsafe and retaliatory practices at DHS, which violated the Pinnacle Plan. The story featuring Burley aired in November 2017. In 2018, when the story of Dahn Gregg aired as a follow up to her story, Burley experienced continued harassment and retaliatory actions taken against Plaintiff Burley and other DHS employees.

156.    After her story aired, Burley was placed on medical leave because she began suffering health issues, including high blood pressure, because of the stress she was under working at DHS. After her concerns were wholly ignored and following months of retaliation for her efforts

34

**EXHIBIT 8**

to protect herself, her coworkers, and the children DHS served, she was forced to submit her resignation due to the toll her employment had taken on her physical and mental health.

### v. *Plaintiff Glenda Simpson*

157.    Plaintiff Simpson spoke out about matters of public concern when she reported employees for policy violations that resulted in children being placed in dangerous situations. After she spoke out, DHS retaliated against her.

158.    Specifically, in 2017, Plaintiff Simpson spoke out about other DHS employees who violated policy and spoke negatively regarding other coworkers; about other DHS employees' policy violations which resulted in children being placed in dangerous situations; and about supervisors who had falsified documents.

159.    Plaintiff Simpson reported to Regional Director, Defendant Whitson and Field Representative Shelly Ernst, that a coworker, Tiffany Monte, had violated policy by using inappropriate language with a foster parent.

160.    Plaintiff Simpson also reported to Defendant Poplin that DHS employee J. Florez had falsified records, stating that she spoke with individuals during case investigations, when she actually had not.

161.    Plaintiff Simpson reported that Defendant Poplin would send out Core/New hires to the field on their own without training, and against policy.

162.    In July 2017, Plaintiff Simpson took an FMLA leave related to symptoms associated with stress. The next month, she took FMLA leave related to a shoulder surgery. She had already undergone two shoulder surgeries after which, upon her return, Defendants did not respect the restrictions put in place by her doctor.

35

**EXHIBIT 8**

163.     On October 3, 2017, Plaintiff Simpson was accused by Defendants Poplin and Whitson of falsifying documents.  This was after she had reported *other* DHS employees for falsifying documents.  Defendants made this accusation against Simpson in retaliation for her speaking out on matters of public concern.

164.     While Plaintiff was out on FMLA leave, she gave a notice of resignation.  However, DHS did not accept her resignation and, instead, forced her to resign "in lieu of termination" so that her record would reflect a termination.

165.     Plaintiff could no longer endure the hostile work environment, retaliation, and other adverse actions (including not being promoted or given a raise and being placed on a punitive work schedule) that she had suffered because she spoke out against wrongdoing within DHS.

### vi.  *Plaintiff Kim Keller*

166.     Plaintiff Keller was employed with DHS as a Child Welfare Specialist from August 2013 through June of 2019.

167.     Keller was assigned to investigate cases in Ottawa and Delaware Counties which are known high risk areas for abuse and neglect for children in rural Oklahoma.

168.     Throughout her employment with DHS, Keller spoke out about matters of public concern within DHS on its failure to follow State and Federal law and to comply with the Pinnacle Plan guidelines which placed workers and children at risk.  After she spoke out, DHS retaliated against her.

169.     Specifically, in or around 2017, Plaintiff Keller reported an inappropriate relationship between DHS employee Laura Henry and a community partner, to Defendants Hailey and Johnston.  The Department was receiving negative and unprofessional attention due to this

36

**EXHIBIT 8**

relationship. After Plaintiff Keller reported this, her coworkers were interrogated any time they were seen speaking with Plaintiff Keller.

170.    Laura Henry and another employee, Jenna Arnett, retaliated against Plaintiff Keller by making allegations against her to Defendant Johnston. Plaintiff was called to Johnston's office and had to explain herself, even though she had done nothing wrong.

171.    On another occasion, Johnston disclosed confidential information regarding Plaintiff to one of her coworkers, Wanda Hogan.

172.    In or around August and October 2017, Plaintiff Keller reported to Defendant Hailey that she was experiencing a hostile work environment and felt that she had been targeted for speaking out. Plaintiff Keller sent an email to Defendant Clifton regarding same.

173.    The only response Plaintiff Keller received was that that they would set up a mediation between Plaintiff Keller and Defendant Johnston. Plaintiff Keller was told the mediation was mandatory and she would be disciplined if she did not attend, even though mediation is voluntary, not mandatory.

174.    On or around July 25, 2017, Plaintiff received a letter from Defendant Clifton regarding her alleged refusal to come to the Regional Office as directed for a meeting. However, the meeting had been set while Plaintiff was on medical leave, and she was unable to attend due to medical issues.

175.    Plaintiff Keller had a lumbar fusion in 2018 and returned to work on or around July 16, 2018. Because she had spoken out in the past, Plaintiff was treated unfairly in relation to her return to work and light duty assignment. Specifically, her restrictions were not respected and she was constantly asked for doctors' notes, above and beyond what was required of other employees who did not speak out.

37

**EXHIBIT 8**

176.    Plaintiff Keller began to suffer with high blood pressure and stress.  Her doctor expressed concerns for her health and again, took her out of work.

177.    Defendant Johnston insisted that she return to work, and threatened to terminate her despite having medical documentation, if she did not.

178.    Defendants Johnston and Feather forced Keller to travel long distances and work hours which exceeded the recommendations and approval by her doctors.

179.    Plaintiff Keller told Defendants Johnston and Feather that she could not adequately assure the safety of the children under her care with the amount of cases she was being assigned and the limited work hours that she was approved to work.

180.    Defendants Johnston and Feather gave Keller notes and told her to give them to her doctor to force her to disclose confidential health information and to force her to continue to work.

181.    Defendant Johnston threatened Keller's work when Keller's physician issued orders that Keller be taken off work.

182.    Throughout her employment Keller reached out to the DHS Office of Civil Rights and no resolution was reached improving her workload or hostile work environment.

183.    In 2017 and 2018, Keller began to openly work with Rachel Bussett and the Bussett Legal Group and the hostile treatment further increased such that Keller stopped pursuing a suit for a period of time.

184.    In June 2019, when Plaintiff Keller could no longer handle the physical and mental attacks and distress caused by working for DHS, she was constructively discharged.  Keller felt she  had no choice but to resign due to the ongoing hostile work environment created from the retaliation of Johnston and Feather after Keller spoke out about DHS's failure to comply with State and Federal law. The ongoing denial of her legal rights and benefits due to her as an employee,

**EXHIBIT 8**

such as leave under FMLA and/or accommodations under the ADA, was jeopardizing her health and safety as well as the health and safety of the children and families of Oklahoma.

### vii. *Plaintiff Nick Brown*

185. Plaintiff Nick Brown was employed with DHS as a Child Welfare Specialist III from January 2010 through January 18, 2019.

186. A CWS III assists the CWS IV who is a supervisor with the management of cases.

187. As a CWS III, Plaintiff Brown was an Assistant Supervisor and should have carried a 50% maximum load or no more than 6 active investigations.

188. DHS consistently identified Plaintiff Brown within DHS's assignment system as being eligible to carry a 100% load.

189. Throughout his employment Plaintiff Brown consistently carried a greater than 50% load which violated the Pinnacle Plan while also assisting CSW I, II, and IV's with their load obligations.

190. Plaintiff Brown spoke out as a citizen over years about matters of public concern within DHS about workload standards violations, the unreasonable expectations placed upon workers, the hostile work environment, the danger to children and the failure of DHS to comply with the Pinnacle Plan.

191. Plaintiff Brown was assigned to investigate cases in Delaware County which is a known high-risk area for children in rural Oklahoma for abuse and neglect.

192. After he spoke out, DHS retaliated against Plaintiff Brown by denying him leave and benefits and increasing his workload and obligations.

193. Specifically, throughout 2018, Plaintiff Brown had differences of opinion with Defendants Johnston and Feather regarding the processes, goals, and work assignments for child

39

**EXHIBIT 8**

welfare workers. He expressed concerns about the demanding caseloads, which violated the Pinnacle Plan.

194.    Although Defendants promised that caseloads would be lowered, they never were.

195.    In or around January 2019, Plaintiff Brown was constructively discharged. His workloads and the environment at DHS made it impossible for him to do his job.

### viii. *Plaintiff Lord Vincent Crutcher*

196.    Plaintiff Lord Vincent Crutcher, is an African American male and was an employee of DHS, working in Oklahoma County, from June 2018 through June of 2020.

197.    Plaintiff Crutcher came to DHS with a desire to work in Permanency Planning based upon his experiences as a child in the DHS foster care system.

198.    Plaintiff Crutcher believed when he was hired that he was being hired to work in Permanency Planning but instead, after he began with the agency, he was advised that he was being assigned to work in Child Protective Services as an Investigator.

199.    The decision to place him in CPS was made by District Director Defendant Mosier who informed Plaintiff Crutcher that there was a greater need for the Department within CPS than Permanency Planning and he was led to believe he would be allowed to transfer at a later date.

200.    During his tenure with DHS, Plaintiff Crutcher applied for numerous positions with Permanency Planning, but he was never allowed to transfer despite co-workers being allowed to transfer who had less experience than he and who were hired after Plaintiff Crutcher .

201.    The difference between Plaintiff Crutcher and his co-workers was that Plaintiff Crutcher spoke out about the failings he observed in the Foster Care system as a worker and as a child.

40

### EXHIBIT 8

202.    Due to the high rate of turnover in CPS many Permanency Workers were forced to supplement CPS workers and perform investigations that they verbalized they were not comfortable or qualified to perform.

203.    The Permanency Workers who spoke out about the lack of training and being assigned investigations without training or consent subsequently were transferred to different offices or positions or left the agency entirely due to the hostile work environment and unreasonable workloads and standards placed on DHS workers.

204.    During Plaintiff Crutcher's employment he observed that the Oklahoma County Division of CPS was consistently understaffed and overworked and he spoke out about the same.

205.    During his employment with DHS, Plaintiff Crutcher was also befriended and mentored by Holly Goralewicz, a DHS CWS who was interviewed by Channel 9 in October 2017 and spoke out about the ongoing violations of State and Federal law and the risks to child safety.

206.    Throughout his employment with DHS, Plaintiff Crutcher observed new and seasoned DHS workers struggle to maintain caseload standards, comply with investigations, and prevent cases from rolling into backlog all while under excessively high standards and under the constant threat of discipline because Region 3, while he worked there, was on a Performance Improvement Plan due to its ongoing failure to comply with the Pinnacle Plan.

207.    Plaintiff Crutcher was placed on a Corrective Action Plan in July 2019 for failing to meet workload standards.  However, not all individuals in the Region were disciplined, reprimanded or placed on Corrective Action Plans like Plaintiff Crutcher was and several supervisors and workers in the office and Region who did not speak out about DHS's failures were promoted while continuing not to meet workload standards, timely complete documentation, and having cases in backlog.

41

**EXHIBIT 8**

208.    While Plaintiff Crutcher was a new worker, he encountered a situation with child safety that caused him great concern involving children who witnessed the death of their grandfather at the hands of their father. Crutcher had serious misgivings about a safety plan put in place by a worker no longer with the agency.  Crutcher was ordered to follow up with the family, but the mother of the children had left the state and the children could not be located. Crutcher was instructed by his superiors at DHS to close the referral on the children as unsubstantiated.

209.    This is only one example of the many violations of State and Federal law and DHS policy and procedure that Crutcher observed as a worker with DHS and at the direction and leadership of Region 3 management which includes Defendants Mosier, Kelly and Gissandaner who are or were management during Crutcher's term of employment with DHS.

210.    The behavior described by Plaintiff Crutcher with regard to the leadership in Oklahoma County and specifically Tanya Mosier is the same kind of behavior described by Plaintiff Heidi Stingley.

211.    Crutcher was targeted by Mosier and others with a Corrective Action Plan for not completing his investigations in a timely manner but Crutcher never received the proper support, guidance, training or assistance to perform his job because of Crutcher pointing out the problems with the system.

212.    When Crutcher would seek assistance or direction from his supervisors or Mosier, he was accused of being insubordinate, acting outside the chain of command or rude when he was instead seeking to understand and learn how to best investigate and act to protect the safety of the children who's lives were entrusted to him to investigate.

**EXHIBIT 8**

213.    Crutcher was set up for failure by being directed to maintain workload standards while being assigned an unmanageable case load according to federal guidelines and the dictates of the Pinnacle Plan.

214.    Because Crutcher was once one of those children in custody who was bounced from home to home and kept away from his siblings, he strived to make sure that each family understood what the CPS system was and how to work within it.  Instead of being viewed as an asset to the families, Mosier and his supervisors used Crutcher's desire to care and help these families against him.

215.    Crutcher was set up for failure by his supervisor Mr. McGarry.  While Crutcher was working in the field he would consult with McGarry and they would reach an agreement about handling a case.  Then when Crutcher would come to the office to complete the case, he would be blindsided by a joint meeting of McGarry and Mosier where McGarry would accuse Crutcher of being unprofessional or handling a situation inappropriately when McGarry had previously been in agreement about the plan.

216.    On multiple occasions Crutcher would go to Mosier, McGarry, and others with his concerns about child safety and DHS's failure to follow protocol and his concerns would be dismissed and he would be told to let it go.

217.    Because Crutcher could not obtain the assistance he needed within his office he reached out to workers outside his office for assistance.

218.    Crutcher was terminated for having cases in backlog when the entire Region 3 was in a backlog crisis and understaffed.

219.    Crutcher was terminated after complaining that cases were being closed without proper documentation and in direct violation of DHS policy and State and Federal law.

43

**EXHIBIT 8**

220.     During his employment with DHS, Crutcher did not have a proper HCM 111 which is an annual review required by DHS policies and Oklahoma regulations.  In fact, on information and belief, none of the Plaintiffs had proper HCM 111s in their file at the time of their actual or constructive discharge.

221.     Crutcher was not given proper training, support or guidance in the completion of his job while being a new worker and assigned a caseload in excess of the State, Federal and Pinnacle Plan guideline.

222.     Plaintiff Crutcher spoke out as a citizen through a Facebook post he made about investigating child abuse in a country club.  He was targeted and disciplined for this protected speech..  Crutcher's post revealed no confidential information and was not a violation of DHS policy and procedure.  Yet he was disciplined for speaking out about a lesson taught in core DHS training that abuse and neglect occurs across all levels of socioeconomic class and race.

223.     Plaintiff Crutcher like the other workers herein simply made the mistake of speaking out about the broken promises at DHS and the failure of the agency to protect children.

224.     In June 2020, Plaintiff Crutcher was terminated in retaliation for his speaking out as a citizen on matters of public concern on the failure of DHS to protect children and follow State and Federal guidelines.

225.     The protected speech of each Plaintiff went above and beyond what they were required to do or say in connection to their official job duties with DHS.  For example, on information and belief, it was the responsibility of the Defendants, not the Plaintiffs, to ensure that DHS complied with the Pinnacle Plan.  Each Plaintiff reported and spoke out about DHS's wrongdoing, as citizens of the State of Oklahoma, and as members of their respective communities.

**D.  *Plaintiffs Have Provided Notice of Tort Claims Pursuant to the Oklahoma Governmental Tort Claims Act***

## EXHIBIT 8

226.    Plaintiffs do not base their *Burk* tort claims on public policy embodied in the Oklahoma Whistleblower Act. Rather, their *Burk* torts are based on public policy embodied in State and Federal law such as Title IV-E and Title IV-B of the Social Security Act, Article 2, Section 22 of the Oklahoma Constitution, Titles 10 and 10A of the Oklahoma Statutes, the Oklahoma Anti-Discrimination Act, Title 340 of the Oklahoma Administrative Code, and the Pinnacle Plan.

227.    By and through these statutes and provisions, the state of Oklahoma has a clear and articulated public policy of protecting employees' free speech rights and the rights of children to be free from abuse and neglect while in the state of Oklahoma. The Oklahoma Statutes impose a duty on all adults to mandatorily report any reasonable belief of abuse or neglect and the Plaintiffs and other Class members attempted to comply with their obligations to report instances of abuse and neglect happening within DHS, and DHS's failures to comply with the law and the Pinnacle Plan designed to ensure worker and child safety.

228.    Notice under the Oklahoma Governmental Tort Claims Act is not required where, as here, Plaintiffs assert the policies embodied in Article 2, § 22 of the Oklahoma Constitution and the Pinnacle Plan, and not the Oklahoma Whistleblower Act as the basis for a *Burk* tort claim. *See Trant v. Oklahoma*, 874 F.Supp.2d 1303-04 (10th Cir. 2012). Further, notice would not be required (even under the Oklahoma Whistleblower Act), where, as here, plaintiffs seek money damages. *Id.* at 1305-06. This is because money damages are not available as an administrative remedy, so exhaustion would be futile. *Id.*

229.    While exhaustion of their tort claims was not required, in an abundance of caution, each Plaintiff (except Brown and Crutcher) has timely filed and served a tort claim upon the State of Oklahoma and DHS.

45

## EXHIBIT 8

230.    Plaintiff Crutcher is still within the time period during which he can timely serve a tort claim.

231.    Each of the Plaintiffs filed tort claims (except Keller's) has been denied by operation of law, since ninety days expired and Plaintiffs received no response to their tort claims. Plaintiff Keller's tort claim will be denied by operation of law on or around September 13, 2020.

232.    Burley, Stingley, and Gregg have separately filed tort claims in their existing cases which they request be adopted and consolidated herein.

233.    Simpson has previously filed and dismissed her tort petition and is timely refiling the same herein according to 12 O.S. §100.

234.    Bolt's claims are being timely amended herein by the filing of this claim.

235.    Each of the Plaintiffs whose tort claims were denied timely filed suit within one hundred and eighty days of the denial.  Less than one year has passed since each of the Plaintiffs timely filed their original suits.[2]  *See* 12 OK Stat. § 100.

## V.    CLASS ACTION ALLEGATIONS

236.    Plaintiffs bring this case individually and, pursuant to 12 OK Stat. § 2023, for equitable relief and damages on behalf of the following Classes:

> All non-supervisory employees who worked in the Child Welfare Services Division of DHS at any time from 5 years before date this Complaint was filed through the date of judgment (the "Pinnacle Class"); and

> All non-supervisory employees who worked in the Child Welfare Services Division of DHS at any time from October 9, 2016 through the date of judgment, who spoke out about matters of public concern

---

[2] The normal statutory deadline of 180 days for filing the tort claim and amending the Section 1983 claims were tolled for Plaintiffs Stingley and Bolt from March 16, 2020 until May 16, 2020 due to the COVID-19 crisis and SCAD orders, SCAD 2020-29, and 2020-36. On March 16, 2020, Bolt had 117 days remaining to amend to add her *Burk* tort claim. Her 117 days began ticking again on May 16, 2020, and this tort claim was filed within that time frame. Additionally, Stingley had 84 days remaining to file or amend her claims when the courts reopened on May 16, 2020 and this matter is being amended prior to the expiration of the same on August 8, 2020.

## EXHIBIT 8

at DHS and were thereafter terminated or constructively terminated (the "Speech Class").

237.    Excluded from the Classes are Defendants and any of their respective members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; the judicial officers, and their immediate family members; and Court staff assigned to this case.  Plaintiff reserves the right to modify or amend the Class definition, as appropriate, during the course of this litigation.

238.    This action has been brought and may properly be maintained on behalf of the Classes proposed herein under the criteria of 12 OK Stat. § 2023.

239.    **Numerosity—12 OK Stat. § 2023(A)(1)**.  The Class Members are so numerous and geographically dispersed that individual joinder of all Class members is impracticable.  The precise number of Class members is unknown to Plaintiffs, but may be ascertained from Defendants' records and, based upon publicly available information, is presumed to be in the hundreds.  Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

240.    **Commonality; Predominance—12 OK Stat. § 2023(A)(2) and (B)(3)**.  This action involves questions of law and fact common to the Classes, which predominate over any individual questions, including, without limitation:

a.    Whether Defendants engaged in the conduct alleged herein;

b.    Whether Plaintiffs and the other Pinnacle Class members are intended third-party beneficiaries of the Pinnacle Plan contract;

c.    Whether Defendants breached their contract with Plaintiffs and the other Pinnacle Class members by violating provisions of the Pinnacle Plan that

47

**EXHIBIT 8**

were put in place to benefit or affect the working environment of Plaintiffs and the other Pinnacle Class members;

d.      Whether Plaintiffs and the other Speech Class members engaged in protected speech;

e.      Whether Defendants retaliated against Plaintiffs and the other Speech Class members by subjecting them to adverse actions because they engaged in protected speech;

f.      Whether certification of the Classes is appropriate under 12 OK Stat. § 2023;

g.      Whether Class members are entitled to declaratory, equitable, or injunctive relief, and/or damages and other relief; and

h.      The amount and nature of relief to be awarded to Plaintiffs and the other Class members.

241.    **Typicality—12 OK Stat. § 2023(A)(3)**. Plaintiffs' claims are typical of the other Class members' claims because Plaintiffs and the other Pinnacle Class members were each subjected to working conditions that violated the Pinnacle Plan and Plaintiffs and the other Speech Class were each terminated for speaking out about the conditions at DHS, including violations of the Pinnacle Plan and State and Federal Law. Plaintiffs and the other Class members suffered damages as a direct and proximate result of the same wrongful conduct in which Defendants engaged. Plaintiffs' claims arise from the same practices and course of conduct that give rise to the other Class members' claims.

242.    **Adequacy of Representation—12 OK Stat. § 2023(A)(4)**. Plaintiffs are adequate Class representatives because Plaintiffs' interests do not conflict with the interests of the other

**EXHIBIT 8**

members of the Class who Plaintiffs seeks to represent, Plaintiffs have retained counsel competent and experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously. Class members' interests will be fairly and adequately protected by Plaintiffs and counsel.

243. **Declaratory and Injunctive Relief—12 OK Stat. § 2023(B)(2).** Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the other Class members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class members as a whole.

## VI.    CLAIMS ALLEGED

### FIRST CLAIM FOR RELIEF

**Breach of Contract on behalf of Plaintiffs and the other Pinnacle Class Members Against All Defendants**

244. Plaintiffs adopt and incorporate paragraphs 1 through 243 as if they were fully set forth herein.

245. Plaintiffs bring this claim individually and on behalf of the other Pinnacle Class members.

246. By agreeing to the Pinnacle Plan, DHS entered into a contract that required DHS to maintain certain standards, including workload and other standards for its employees.

247. On information and belief, Defendants Lake, Brown, Shropshire, Ledoux, Majors, Powell, Kelly, Clifton, Whitson, Howell, Gissandaner, Johnston, Hailey, Feather, and Poplin have, during the relevant time period, been responsible for ensuring that DHS meets its obligations under the Pinnacle Plan.

49

**EXHIBIT 8**

248.    Plaintiffs and the other Pinnacle Class members were intended third-party beneficiaries of the contract created by the Pinnacle Plan because the Pinnacle Plan was made expressly to benefit employees, including Plaintiffs and members of the Pinnacle Class.

249.    DHS breached its contract in relation to Plaintiffs and other members of the Pinnacle Class when it failed to adhere to the requirements of the Pinnacle Plan, including by maintaining workload and other standards for its employees as set forth in the Pinnacle Plan. The other Defendants were responsible for and acted to cause those breaches.

250.    Plaintiffs and the other Pinnacle Class members have been damaged — in an amount to be proven at trial in excess of $75,000.00 — in that they were forced to work under conditions that violated the Pinnacle Plan.

**SECOND CLAIM FOR RELIEF**

**First Amendment Retaliation Under 42 U.S.C. § 1983 on behalf of Plaintiffs and the other Speech Class Members Against All Defendants**

251.    Plaintiffs adopt and incorporate paragraphs 1 through 243 as if they were fully set forth herein.

252.    Plaintiffs and the other Speech Class members spoke as private citizens, not in connection with their official DHS duties, regarding matters of public concern at DHS, including violations of the Pinnacle Plan, State and Federal law, and other unsafe and inappropriate things that were going on within DHS.

253.    Plaintiffs each spoke about matters beyond their normal job duties and outside of performing their normal job duties.

254.    These issues are of public concern because they relate to important social and community issues, including the safety and care of the children and families of Oklahoma, and oversight and the proper functioning of the government.

**EXHIBIT 8**

255. The speech of Plaintiffs and other members of the Speech Class was protected by the First Amendment to the United States Constitution.

256. DHS's interest as an employer in promoting efficiency of public service does not outweigh the free speech interests of Plaintiffs and other members of the Speech Class.

257. Defendants Lake, Brown, Shropshire, Ledoux, Majors, Powell, Kelly, Clifton, Whitson, Howell, Gissandaner, Johnston, Hailey, Feather, and Poplin, in their individual capacities and capacities as DHS employees, each violated the first and fourteenth amendment rights of Plaintiffs and the other Class members in violation of 42 U.S.C. § 1983.

258. Plaintiffs and other members of the Speech Class were terminated, constructively terminated, or otherwise subject to adverse employment actions because of their exercise of their First and Fourteenth Amendment rights.

259. DHS, through the other Defendants, imposed a *de facto* policy and practice of retaliating against employees who spoke out against the conditions within DHS.

260. If it were not for their protected activity, DHS by and through the other Defendants in their individual capacities, and capacities as employees of DHS, would not have taken this adverse action against Plaintiffs and members of the Speech Class.

261. The protected speech of Plaintiffs and the other Speech Class members was a substantial or motivating factor in the adverse actions Defendants took against them.

262. DHS, through the other Defendants, imposed a *de facto* policy and practice of retaliating against employees who spoke out against the conditions within DHS.

263. Plaintiffs and the other Speech Class members have been damaged —in an amount to be proven at trial — in that they were retaliated against for exercising their free speech rights.

**EXHIBIT 8**

## THIRD CLAIM FOR RELIEF

### *Burk* Tort on behalf of Plaintiffs and the other Speech Class members Against All Defendants

264.     Plaintiffs adopt and incorporate paragraphs 1 through 243 as if they were fully set forth herein.

265.     A *Burk* tort provides an exception to at-will employment allowing employees to sue for wrongful termination when discharge is contrary to a clear mandate of public policy as articulated by constitutional statutory, or decisional law.

266.     Plaintiffs and the other members of the Speech Class, all of whom were at-will employees, were actually or constructively discharged, or otherwise subjected to adverse employment actions by DHS, for reasons that violate a clear mandate of Oklahoma's public policy goals as enumerated by Article 2, § 22 of the Oklahoma Constitution, Titles 10 and 10A of the Oklahoma Statutes, the Oklahoma Anti-Discrimination Act, Title 340 of the Oklahoma Administrative Code, and the Pinnacle Plan. .

267.     Specifically, Plaintiffs and the other members of the Speech Class spoke out by reporting the wrongful activities of DHS and were retaliated against for their speech activities.

268.     DHS, through the other Defendants, imposed a *de facto* policy and practice of retaliating against employees who spoke out against the conditions within DHS.

269.     Plaintiffs have provided notice of their *Burk* torts as described herein, although they do not believe that such notice was required.

270.     Plaintiffs and the other Speech Class members have been damaged—in an amount to be proven at trial — in that they were retaliated against for reasons that violate Oklahoma public policy.

52

**EXHIBIT 8**

## VII.   **REQUEST FOR RELIEF**

Plaintiffs, individually and on behalf of the other members of the Classes, respectfully request that the Court enter judgment in their favor and against Defendants as follows:

a.   Certifying the Classes as requested herein, designating Plaintiffs as class representatives, and appointing the undersigned counsel as Class Counsel;

b.   Declaring that Defendants are financially responsible for notifying the Class members of the pendency of this suit;

c.   Declaring that Defendants violated the Pinnacle Plan and enjoining them from further violations;

d.   Entering an injunction requiring Defendants to comply with the terms of the Pinnacle Plan.

e.   Awarding Plaintiffs and the other Class members damages, including compensatory damages, punitive damages, damages for garden variety emotional distress, and all other available damages, in an amount to be determined at trial.

f.   Awarding Plaintiffs their reasonable attorneys' fees and expenses;

g.   Awarding pre- and post-judgment interest on any amounts awarded; and

h.   Awarding such other and further relief as may be just and proper.

## **EXHIBIT 8**

## VIII.   <u>JURY TRIAL DEMANDED</u>

Plaintiffs demand a trial by jury on all causes of action so triable.

WHEREFORE, the Plaintiffs respectfully request that the Court grant them judgment in their favor

and against each of the Defendants and award them the attorney's fees, costs and expenses they

are entitled to by law.

Dated:  July 14, 2020

Respectfully submitted,

Rachel Bussett, OBA#19769
Patricia Podolec, OBA # 21325
Kindra N. Dotson Avila, OBA# 22547
Katherine Bushnell, OBA#34196
**Bussett Legal Group, PLLC**
2201 N. Classen Blvd.
Oklahoma City, Oklahoma  73106
Telephone:  (405) 605-8073
Fax: (405) 212-9112
Rachel@BussettLegal.com
PPodolec@BussettLegal.com
Kathy@BussettLegal.com
Kindra@BussettLegal.com

***Counsels for Plaintiffs and the Putative Classes***

54

# <u>EXHIBIT 8</u>